IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


LAWRENCE CURTIS BAKER, JR.,
        Petitioner,

vs.                                              Case No.:  5:14cv273/RV/EMT

JULIE L. JONES,
        Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus and supporting memorandum, filed pursuant to 28 U.S.C. § 2254 (ECF Nos. 1, 2). Respondent filed an answer and relevant portions of the state court record (ECF No. 20).  Petitioner filed a reply (ECF No. 23), which he subsequently amended (ECF No. 25).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of

the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 20).[1]   Petitioner was charged in the Circuit Court in and for Jackson County, Florida, Case No. 2010-CF-419, with one count of attempted first degree murder of a law enforcement officer with a firearm (Count I) and one count of felon in actual possession of a firearm (Count II) (Ex. A at 1).   On March 29, 2012, a jury trial was held on only the attempted murder charge (Exs. D, E).   The jury found Petitioner not guilty (Ex. B at 284–85).   On June 26, 2012, a jury trial was held on the possession of a firearm charge (Ex. F).   The jury found Petitioner guilty as charged (Ex. B at 372).   On August 8, 2012, Petitioner was sentenced as a violent career criminal to forty (40) years of imprisonment, with a mandatory minimum term of thirty (30) years, with pre-sentence jail credit of 780 days (Ex. C at 407–53, 486–94).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 20).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D12-4309 (Ex. G).  The First DCA affirmed the judgment per curiam without written opinion on July 23, 2013, with the mandate issuing August 8, 2013 (Ex. J).  Baker v. State, 117 So. 3d 413 (Fla. 1st DCA 2013) (Table).  Petitioner did not seek further review.

On September 3, 2013, Petitioner filed a petition for writ of habeas corpus in the First DCA, alleging ineffective assistance of appellate counsel (Ex. K).  The First DCA denied the petition on the merits on October 10, 2013 (Ex. L).  Baker v. State, 123 So. 3d 113 (Fla. 1st DCA 2013) (Mem).

Also on September 3, 2013, Petitioner filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. M at 1–7).  In an order rendered October 21, 2013, the state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion within sixty days (*id.* at 8).  Petitioner filed an amended motion on November 8, 2013 (*id.* at 9–18).  The state circuit court summarily denied it on February 20, 2014 (*id.* at 19–21).  Petitioner appealed the decision to the First DCA, Case No. 1D14-1766 (Ex. O).  The First DCA affirmed the judgment per curiam

without written opinion on July 23, 2014, with the mandate issuing August 19, 2014 (Ex. P).  Baker v. State, 147 So. 3d 981 (Fla. 1st DCA 2014) (Table).

On July 31, 2014, Petitioner filed a second Rule 3.850 motion (Ex. Q).  In an order rendered September 17, 2014, the state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion within sixty days (*id.*).  Petitioner filed an amended motion on September 24, 2014 (Ex. R).  The state circuit court denied it as impermissibly successive on October 27, 2014 (Ex. S). Petitioner appealed the decision to the First DCA, Case No. 1D15-0056 (Ex. V).  The First DCA affirmed the judgment per curiam without written opinion on March 17, 2015, with the mandate issuing April 15, 2015 (Ex. W).  Baker v. State, 160 So. 3d 410 (Fla. 1st DCA 2015) (Table).

Petitioner filed the instant federal habeas action on October 17, 2014 (ECF No. 1).

## II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April

24, 1996, it is subject to the more deferential standard for habeas review of state court

decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death

Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In

relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved
>> an unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>> (2)   resulted in a decision that was based on an
>> unreasonable determination of the facts in light of the evidence
>> presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review

in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The

appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas
> corpus with respect to claims adjudicated on the merits in state court.

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by
Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer)
in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the
Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in
part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter,
Ginsburg, and Breyer.

> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied—the state court adjudication resulted in a decision
> that (1) "was contrary to . . . clearly established Federal law, as
> determined by the Supreme Court of the United States," or (2) "involved
> an unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  Under the
> "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by this court on a
> question of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S.

156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme

Court has instructed that on any issue raised in a federal habeas petition upon which

there has been an adjudication on the merits in a formal State court proceeding, the

federal court should first ascertain the "clearly established Federal law," namely, "the

governing legal principle or principles set forth by the Supreme Court at the time the

state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.

Ct. 1166, 155 L. Ed. 2d 144 (2003).  "Clearly established Federal law, includes only

the holdings, as opposed to the dicta, of the Supreme Court's decisions."  Woods v.

Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation

omitted).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.  However, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be

contrary to any holding from this Court." (internal quotation marks and citation omitted)).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Richter).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified

that: "a decision adjudicated on the merits in a state court and based on a factual

determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state-court proceeding."

Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003)

(dictum).

When performing its review under § 2254(d), the federal court must bear in

mind that any "determination of a factual issue made by a State court shall be

presumed to be correct," and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence."   28 U.S.C.

§ 2254(e)(1); see e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can

disagree with a state court's factual finding and, when guided by AEDPA, "conclude

the decision was unreasonable or that the factual premise was incorrect by clear and

convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007)

(holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by

clear and convincing evidence," and concluding that that standard was satisfied where

prisoner showed "clearly and convincingly" that the state court's decision

"contain[ed] an 'unreasonable determination' of fact.").   The "unreasonable

determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See* Gill, 633 F.3d at 1292.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision.  *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.   PETITIONER'S CLAIMS

A.   <u>Ground One</u>:  "Petitioner's case derives from an illegal traffic stop and illegal pursuit of Petitioner, conducted by law enforcement officer Bret [sic] Preston (police officer) in Sneads, Florida, outside the city limits the morning of 7-3-10."

<u>Ground Two</u>:  "On 7-3-10, police officer Bret [sic] Preston in Sneads, Florida, illegally pursued Petitioner outside the city limits."

In Ground One, Petitioner claims that Officer Brett Preston had no legal basis for stopping the car in which Petitioner was a passenger, because Preston had no reasonable suspicion of any criminal activity related to the vehicle, there had been no BOLO (Be On the Look Out) issued in relation to the vehicle or its occupants, and Officer Preston did not observe a traffic infraction (ECF No. 1 at 5; ECF No. 2 at 2–4).  In Ground Two, Petitioner claims that Officer Preston had no legal basis for pursuing Petitioner when Petitioner exited the vehicle (ECF No. 1 at 6; ECF No. 2 at 3–4).  Petitioner asserts he did not do anything illegal in the vehicle or upon exiting the vehicle, he did not have any outstanding warrants for his arrest, and Officer Preston had not been instructed to apprehend Petitioner or question either Petitioner or the driver of the vehicle (*id.*).  Petitioner contends that the stop and pursuit violated the Fourth Amendment (*id.*).

Respondent contends Petitioner failed to exhaust either of these claims in the state courts and is now procedurally barred from doing so (ECF No. 20 at 14–26). Respondent contends Petitioner cannot satisfy the "cause and prejudice" exception to the procedural bar, because he cannot show that the Fourth Amendment claim is meritorious (*id.*).  Respondent generally preserves "all available procedural bars" (*id.* at 9).

In Petitioner's reply, he contends that defense counsel raised both Fourth Amendment issues (i.e., the legality the stop and the legality of Officer Preston's pursuit of Petitioner) in the trial court (ECF No. 25 at 2–7).  Petitioner asserts the trial court held hearings, but then denied relief (*id.*).  Petitioner states he presented a claim of ineffective assistance of appellate counsel ("IAAC") to the First DCA, based upon appellate counsel's failure to argue the Fourth Amendment issues on direct appeal (ECF No. 25 at 4, 6; ECF No. 23-1, Ex. A).  He contends this constitutes "cause" for the procedural default (*id.*).  Petitioner contends he has demonstrated "prejudice," because the record demonstrates a Fourth Amendment violation (*id.*).

Federal courts are precluded from conducting post-conviction review of a petitioner's Fourth Amendment claim of an unconstitutional search or seizure if the state courts provided "an opportunity for full and fair litigation" of that claim.  Stone v. Powell, 428 U.S. 465, 494, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976); *see also* Bradley v. Nagle, 212 F.3d 559, 564 (11th Cir. 2000); Huynh v. King, 95 F.3d 1052, 1058 (11th Cir. 1996).[3]  This bar applies if the State has provided an opportunity for full and fair litigation of the claim "whether or not the defendant employs those

---

[3] The Stone rule may be raised by a court sua sponte.  *See* Davis v. Blackburn, 803 F.2d 1371, 1372–73 (5th Cir. 1986) ("[W]e are obliged to apply Stone as a prudential limitation on the exercise of our jurisdiction . . ., even if it must be raised sua sponte.").

See 5:14-cv-00273-RV-EMT

processes." <u>Huynh</u>, 95 F.3d at 1058 (citing <u>Caver v. Alabama</u>, 577 F.2d 1188, 1192 (5th Cir. 1978)).  "In <u>Stone</u>, the Court reasoned that, so long as a defendant had the opportunity to present his Fourth Amendment claims to the state trial and appellate courts, the objectives of the exclusionary rule have been satisfied." <u>Bradley</u>, 212 F.3d at 564–65.  For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires "consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court." <u>Mincey v. Head</u>, 206 F.3d 1106, 1126 (11th Cir. 2000) (quoting <u>Tukes v. Dugger</u>, 911 F.2d 508, 513–14 (11th Cir. 1990)); <u>Caver</u>, 577 F.2d at 1192 ("'[F]ull and fair consideration' of a fourth amendment claim [includes] at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute."); *see also* <u>Stone</u>, 428 U.S. at 494 n.36.  Furthermore, even if a state court erred in its Fourth Amendment analysis, a federal court will not consider the merits of a Fourth Amendment claim so long as the petitioner was provided an opportunity for full and fair litigation of the claim.  *See* <u>Swicegood v. State of Ala.</u>, 577 F.2d 1322, 1324 (5th Cir. 1978).[4]

---

[4] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before

The state court record demonstrates that Petitioner was given a full and fair opportunity to present facts to the trial court.  Petitioner's trial counsel, Attorney Clyde Taylor, filed a motion to dismiss the charging document, on the ground that all of the evidence supporting the charges was obtained as a result of the illegal stop of a vehicle driven by Chadeedra Johnson, in which Petitioner was a passenger (Ex. A at 32–39).  Attorney Taylor contended that the undisputed facts showed that Officer Brett Preston did not have reasonable suspicion or probable cause to stop Ms. Johnson's vehicle; therefore, the stop violated the Fourth Amendment (*id.*).  The trial court held a hearing on the motion to dismiss on October 11, 2011, at which Petitioner's new counsel, Attorney Wade Mercer, announced that he believed that the more appropriate vehicle for hearing the issue of the legality of the stop would be in a motion to suppress (Ex. A at 126–40).  The court, with defense counsel's consent, denied the motion to dismiss without prejudice, with the understanding that the defense would file a motion to suppress, and the issue of the legality of the stop would be heard at an evidentiary hearing (*id.* at 135–36).

Defense counsel subsequently filed a motion to suppress and/or dismiss, challenging the legality of Officer Preston's stop of Ms. Johnson's vehicle, and

---

the close of business on September 30, 1981.

Officer Preston's pursuit of Petitioner (Ex. A at 141–42).  A hearing was held on October 11, 2011 (*id.* at 169–201).  The State and defense counsel stipulated to the admission of a transcript of a sworn statement provided by Officer Preston (*id.* at 143–67, 172–74).  In his statement, Officer Preston stated that on the morning of July 3, 2010, he discussed with another other officer that Petitioner had called the police department and threatened the police chief and another officer (*id.* at 145).  Preston stated that he and the other officer also discussed the fact that Chadeedra Johnson, Petitioner's girlfriend, had turned over a shotgun to police after she and Petitioner had an altercation at a Tom Thumb store earlier in the week (*id.*).  Officer Preston stated that Petitioner was on probation for burglary with an assault, with Ms. Johnson being the victim of the assault (*id.*).  Preston also stated that the police chief was investigating whether Petitioner violated his probation by possessing the shotgun that Ms. Johnson had given to police (*id.*).

Officer Preston stated that after his discussion with the other officer, he initiated contact with Ms. Johnson in her vehicle to "find out what was going on with [Petitioner]" and "what he has against [the police]" (*id.* at 146).  Preston stated that he intended to inquire of Ms. Johnson whether she knew where Petitioner was, and why he was threatening police (*id.* at 152).  Officer Preston activated his "blue lights," and

Ms. Johnson stopped her vehicle (*id.* at 147).  As Officer Preston exited his patrol car,

he observed Petitioner in the passenger side of Ms. Johnson's vehicle (*id.*).  Petitioner

exited Ms. Johnson's vehicle and began to walk away (*id.*).   Officer Preston said,

"Curtis, where you going; Curtis, where you going; come here; Curtis, where you

going" (*id.*).   Petitioner shook his head and continued walking (*id.*).   As Officer

Preston returned to his patrol car, Petitioner began running (*id.*).   Preston began

pursuing Petitioner in his patrol car (*id.*).   Petitioner stopped running, and as Preston

attempted to exit his patrol car, Petitioner turned toward Preston and started shooting

at the patrol car (*id.* at 147–48, 156).   Petitioner stopped shooting and turned around

and started running (*id.* at 148, 157).   Preston exited the patrol car and started shooting

at Petitioner (*id.*).

The State presented a sworn statement from Chadeedra "Dee Dee" Johnson (Ex.

A at 82–109).  Ms. Johnson stated that prior to her contact with Officer Preston, she

had informed police that Petitioner had guns in her house, and she consented to

officers' removing the guns from her house (*id.* at 85).  Ms. Johnson stated that the

night before her contact with Officer Preston, Petitioner spent the night at her house

(*id.* at 105).  Ms. Johnson stated that Petitioner told her that he knew that when he

called the police department and "cussed" and threatened the police that he was

"gone" (*id.* at 105).   Ms. Johnson stated that the next morning, Petitioner left her

house, so she got into her car to leave (*id.* at 86, 93, 105–06).   Ms. Johnson stated that

as she approached a stop sign, Petitioner jumped into her car and told her that they

were going to the "country," and she was not leaving him (*id.* at 86, 93–94, 96, 106).

Ms. Johnson testified that she drove as Petitioner directed (*id.* at 86).   Johnson stated

that she saw Officer Preston's patrol car, and made an intentional gesture with her

hands and swerved the car in an attempt to catch Officer Preston's attention to alert

him that there was a problem (*id.* at 95, 108–09).   Johnson stated that Officer

Preston's police car pulled behind the car that was behind her (Johnson's) car and

activated the blue lights (*id.* at 86–87, 95).   She stated that the car behind hers pulled

over, but Officer Preston continued behind her car (*id.* at 86–87, 96).   Ms. Johnson

stated that Petitioner told her not to stop, but she told Petitioner she did not want to

appear that she was fleeing police (*id.* at 87, 96).   Ms. Johnson stated that Petitioner

responded that if she stopped, something bad would happen (*id.*).   Ms. Johnson stated

that Petitioner had a gun in his lap (*id.* at 87, 95, 98–99, 107).   Ms. Johnson stated that

she pulled over, and as Officer Preston was exiting his patrol car, Petitioner exited her

car and began to run (*id.* at 87, 97).   Ms. Johnson stated that Officer Preston got back

in his car and pursued Petitioner through a field (*id.* at 87–88).

The State conceded that there was no evidence that Officer Preston observed Ms. Johnson's hand gesture, or saw her vehicle swerve (Ex. A at 196).  The State also conceded that at the time Officer Preston pursued Petitioner, he did not have probable cause to arrest Petitioner for possessing a firearm, but police were still investigating that offense (*id.* at 197–99).

The court provided defense counsel and the State an opportunity to present testimony of additional witnesses (Ex. A at 172, 174).  Both parties declined to present any other evidence (*id.* at 174).  Defense counsel and the State presented argument in support of their positions (*id.* at 174–93).  Defense counsel sought to exclude statements made by Petitioner after he was apprehended (statements he made in a patrol car, in an ambulance, and at a hospital), bullet fragments found in Officer Preston's patrol car, and evidence recovered from the field (*id.* at 193–94).  The parties agreed that there was no evidence recovered from Ms. Johnson's car (*id.* at 194).

Following the hearing, the trial court issued an order denying the motion to suppress and/or motion to dismiss (Ex. B at 202–46).  The court adjudicated the Fourth Amendment issues as follows:

> THIS MATTER is before the Court on the Defendant's Motion to Suppress Evidence and Statement of Defendant and/or Motion to

Dismiss filed September 29, 2011.  Having considered said Motion, court file and records, the State's Memorandum of Law, the arguments of the parties at the hearing held on October 11, 2011, and being otherwise fully advised, this Court finds that:

On July 3, 2010, the Defendant was the sole passenger in a vehicle driven by his girlfriend Chadeedra Johnson in the Sneads area of Jackson County, Florida.  According to the sworn statement of Officer Brett Preston from the Sneads Police Department dated July 21, 2010 provided by the defense, Officer Preston stopped the car due to Officer Preston's desire to speak with the driver (Chadeedra Johnson) regarding a conflict between her boyfriend (the Defendant) and another officer(s) of the Sneads Police Department.  At the time of the encounter with the driver of the vehicle, Officer Preston was not aware of the Defendant's physical presence inside the vehicle.  However, Chadeedra Johnson indicated in a statement given on July 3, 2010 to Chief Burt McAplin from the Sneads Police Department that she noticed a police car and she was trying to do some things to get the officer's attention because the Defendant had a gun and was basically holding her against her will.  Ultimately, the Defendant ran from the car into a field and was chased by Officer Preston.  During that chase, the Defendant shot Officer Preston while he fled on foot from the scene.  Defendant was not apprehended until sometime later when he turned himself in voluntarily and that is when Defendant gave his first statement to law enforcement.  Defendant later provided a second statement to two special agents from the Florida Department of Law Enforcement (FDLE).

Defendant, through counsel, files the instant motion requesting the Court to determine the stop of the vehicle was unlawful and to further suppress any and all physical evidence found as a result of the stop, including any statements made by the Defendant during or after his arrest, and any other fruits of the wrongful stop or seizure of the Defendant.  However, the Court finds that the Defendant's shooting of Officer Preston was an intervening illegal act that removed any taint that may have come from the traffic stop in this cause.  A person is not entitled to use physical force to contest an illegal arrest.  *See Slate v.*

*Clavette*, 969 So. 2d 463, 466 (Fla. 5th DCA 2007).  As a result, Defendant's independent act of misconduct—shooting Officer Brett Preston—subsequent to the traffic stop created the probable cause that was then needed for the arrest of Defendant for Attempted Murder on a Law Enforcement Officer.  Therefore, any physical evidence collected as a result of the Defendant's independent act of shooting at Officer Brett Preston shall be admissible against the Defendant.

Further, Ms. Johnson's statement to law enforcement indicates that she was trying to get the officer's attention when she saw him (Officer Preston) due to the Defendant holding her against her will with a gun in his immediate possession. Consequently, Defendant's commission of a felony upon his girlfriend while inside the vehicle would have provided probable cause and justification to detain the Defendant had the officer known beforehand what had occurred prior to the stop.  Furthermore, Officer Preston's sworn statement demonstrates that he had prior knowledge about an incident which occurred earlier in the week with Defendant's girlfriend turning over a firearm to law enforcement which resulted in threats being made against law enforcement by the Defendant. According to Officer Preston's statement, Chief McAplin of the Sneads Police Department was attempting to violate the Defendant for having the firearm that was delivered to law enforcement by Chadeedra Johnson after an altercation she had with the Defendant earlier in the week at a convenience store.   In addition, Officer Preston had independent knowledge of the Defendant being on probation due to his direct involvement in that particular criminal case which would not permit the Defendant to have possession of a firearm.  Based upon these factors, the automobile stop by the officer was legal and justifiable.  In any event, the Defendant's independent act of misconduct which occurred after the stop created sufficient probable cause at that time for the arrest of the Defendant.

Finally, Defendant's motion requests the Court to suppress any and all statements made by the Defendant to law enforcement authorities after his arrest on the instant charges.   The Court finds that the Defendant's independent act of misconduct should not preclude the

admissibility of this evidence against the Defendant.  However, the Court did not receive any testimony or arguments at the hearing on the instant motion which specifically address the voluntariness of Defendant's statements to police.  As a result, this order does not in any way hinder the Defendant's ability to challenge the voluntary nature of the Defendant's statements provided to law enforcement at a later date for suppression.  Therefore, it is

ORDERED AND ADJUDGED that the Defendant's Motion to Suppress Evidence and Statement of Defendant and/or Motion to Dismiss is hereby DENIED.

(Ex. B at 202–03).

Appellate review of the trial court's decision was available to Petitioner, but Petitioner's appellate counsel chose not to raise the issue on direct appeal.  In response to Respondent's argument that Petitioner procedurally defaulted his Fourth Amendment claim by failing to raise it on direct appeal, Petitioner contends the procedural default was caused by his appellate counsel's ineffectiveness (*see* ECF No. 25).  Even if Petitioner extended this argument in response to the <u>Stone v. Powell</u> rule, and contended that appellate counsel's ineffectiveness deprived him of a full and fair opportunity to litigate the Fourth Amendment issue in the state court, he would not be entitled to federal review of his Fourth Amendment claims.

Assuming *arguendo* that a federal habeas petitioner may obtain relief from the <u>Stone v. Powell</u> bar by demonstrating that, even though appellate review of his Fourth

Amendment claims was available, ineffectiveness of his appellate counsel deprived him of a full and fair opportunity to litigate his Fourth Amendment claim, Petitioner has failed to make that showing in this case.

The standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *See* <u>Smith v. Robbins</u>, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted). The two components of an ineffectiveness claim under <u>Strickland</u> are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. <u>Strickland</u>, 466 U.S. at 697. The focus of inquiry under the performance prong of <u>Strickland</u> is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691. Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal. *See* <u>Jones v. Barnes</u>, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). To demonstrate prejudice, the petitioner must show a reasonable

probability that, but for his counsel's unreasonable failure to brief a particular issue, the petitioner would have prevailed on appeal.  *See* Robbins, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the Strickland standard with regard to claims of ineffective assistance of appellate counsel. Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit."  United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)). Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal.  Nyhuis, 211 F.3d at 1344 (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir.1988)).

The state court record demonstrates that on direct appeal, Petitioner's counsel presented the following issue:

> The trial court fundamentally erred in permitting evidence of an acquitted crime—attempted murder on a law enforcement officer—to prove up the firearm possession case.

(Ex. G).  The First DCA affirmed the conviction per curiam without written opinion (Ex. J).

To determine whether Petitioner was denied the opportunity for appellate review of his Fourth Amendment claims, due to ineffectiveness of his appellate

counsel, the court will assess the reasonableness of appellate counsel's omission of the Fourth Amendment issue from Petitioner's appellate brief.

"The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures." United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003). "There are three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006); Popple v. State, 626 So. 2d 185, 186 (Fla. 1993).

The first category, police-citizen encounters, does not implicate the Fourth Amendment. Perez, 443 F.3d at 777; Popple, 626 So. 2d at 186 (citing United States v. Mendenhall, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002). Thus, "[o]fficers are free, without any level of suspicion, to approach citizens on the street or in a public place." Miller v. Harget, 458 F.3d 1251, 1257 (11th Cir. 2006).

With regard to the second category, brief seizures or investigatory detentions, an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.  Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.  United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).  The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity.  Terry, 392 U.S. at 27.  Individual facts capable of innocent interpretation may give rise to reasonable suspicion when viewed as a whole.  United States v. Arvizu, 534 U.S. 266, 274–75, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002).  A court must review the totality of the circumstances to determine whether an officer had a "particularized and objective basis" to suspect legal wrongdoing.  Id., 534 U.S. at 273.

"[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business."  Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570

(2000) (citing <u>Florida v. Royer</u>, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)).  Any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."  <u>Florida v. Bostick</u>, 501 U.S. 429, 437, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991).  However, the Supreme Court and the Eleventh Circuit have recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.  *See* <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 885, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975); <u>Florida v. Rodriguez</u>, 469 U.S. 1, 6, 105 S. Ct. 308, 83 L. Ed. 2d 165 (1984) (per curiam); <u>Sokolow</u>, 490 U.S. at 8–9; <u>United State v. Gordon</u>, 231 F.3d 750, 756–57 (11th Cir. 2000) (flight from law enforcement is a relevant factor in determining whether reasonable suspicion exists).  As the Supreme Court noted in <u>Wardlow</u>:

> Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.  In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists.  Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

528 U.S. at 124–25 (citing <u>United States v. Cortez</u>, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)).

Evidence that is uncovered as the result of an unreasonable search or seizure must be suppressed as "fruit of the poisonous tree."  *See* Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); United States v. Bailey, 691 F.2d 1009, 1012–13 (11th Cir. 1982).  Evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint, and it is not to be excluded.  *See* Segura v. United States, 468 U.S. 796, 804–05, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984).  In determining whether evidence is "fruit of the poisonous tree" and, therefore, must be excluded, the relevant question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).  The government may "purge the taint" by proving that there was a break in the causal link between the initial illegal search and the eventual seizure, such as by establishing that the evidence in question was seized pursuant to an independent source.  *See* United States v. Davis, 313 F.3d 1300, 1303 (11th Cir. 2002) (citing Bailey, 691 F.2d at 1013).  Under the "independent source" doctrine, the challenged evidence is admissible if it was obtained from a lawful source, independent

of the illegal conduct.  *See* <u>Davis</u>, *supra* (citing <u>United States v. Terzado–Madruga</u>,

897 F.2d 1099, 1113 (11th Cir. 1990)).

Florida courts have held that evidence of a crime committed in reaction to an

illegal stop or search, for example attacking the stopping or searching officer, is

admissible notwithstanding the prior illegal arrest or search.  <u>State v. Clavette</u>, 969 So.

2d 463, 466 (Fla. 5th DCA 2007) (citing <u>State v. Freeney</u>, 613 So. 2d 523, 525 (Fla.

2d DCA 1993)).  The rule adopted by the courts has been explained as follows:

> In cases where the response has been a physical attack . . . courts have again held that the evidence of this new crime is admissible. Illustrative is <u>Commonwealth v. Saia</u>, [372 Mass. 53, 360 N.E. 2d 329 (1977)], where an officer was attacked by two men after he had made an entry into their premises.  Although the court was inclined to the view that the entry was lawful, it was held that the evidence of this assault would be admissible even if the officer had been engaged in an illegal search.

> Even if one assumes the illegality of the entry there is no showing that the evidence sought to be suppressed is an "exploitation" of the primary illegality. . . .  What is present here is simply an attempt to suppress evidence which is a result of allegedly willful acts of misconduct by [the defendants], whose provocation and perhaps ultimate defense may be found in the fact of the entry itself.  The exclusionary rule does not reach this far.

> . . . Suppose a police officer or other person had been killed in the affray that allegedly occurred here. That hypothesis illustrates the inappropriateness of any ruling that the observations of the police were inadmissible under the exclusionary rule in the circumstances of these cases.

>    In these cases as well, it is sometimes said by way of explanation
> that the attack upon the officer was a "free and independent action."  But
> here . . . the better basis of distinction is that no exploitation of the prior
> illegality is involved and that the rationale of the exclusionary rule does
> not justify its extensions to this extreme.   "Application of the
> exclusionary rule in such fashion," as one court put it, "would in effect
> give the victims of illegal searches a license to assault and murder the
> officers involved—a result manifestly unacceptable."

Clavette, 969 So. 2d at 466–67 (citing 4 Wayne R. LaFave, Search and Seizure,

§ 11.4(j) (4th ed. 2004)).

    To determine whether evidence is sufficiently distinguishable from the illegality

of the stop or search, Florida courts consider three factors:  "(1) the time elapsed

between the illegality and the acquisition of the evidence; (2) the presence of

intervening circumstances; and (3) the purpose and flagrancy of the official

misconduct."  State v. H.D., 113 So. 3d 917, 918–19 (Fla. 2d DCA 2013) (citing State

v. Frierson, 926 So. 2d 1139, 1143 (Fla. 2006)).  No single factor is dispositive; the

court must base its determination on the totality of the circumstances.  *See* H.D., 113

So. 3d at 919 (citing Frierson, 926 So. 2d at 1144).

    In the instant case, the trial court's decision to deny the motion to suppress

would have come to the appellate court cloaked with a presumption that its factual

findings were correct, but the appellate court would have applied a de novo standard

of review to legal issues and mixed questions of law and fact.  *See* Smithers v. State,

826 So.2d 916, 924–25 (Fla. 2002).  Based upon the evidence submitted to the trial court at the hearing on the motion to suppress, Petitioner's appellate counsel could have reasonably winnowed out the Fourth Amendment issues in favor of the stronger argument concerning the trial court's admission of evidence of the "acquitted charge" (attempted murder of Officer Preston) at Petitioner's trial on the possession charge.

Based upon Chadeedra's Johnson's sworn statement that she welcomed the initial encounter with Officer Preston, appellate counsel could have reasonably concluded that Officer Preston's approaching Ms. Johnson's vehicle was consensual and thus legal.  Additionally, appellate counsel could have reasonably concluded that Officer Preston had reasonable suspicion to justify his pursuit of Petitioner.  The evidence presented to the trial court showed that at the time Officer Preston began his pursuit, he was aware that (1) Petitioner was a convicted felon; (2) Petitioner was on probation for burglary with an assault, with the victim being Ms. Johnson; (3) Ms. Johnson had turned over to police a shotgun she retrieved from her house, and the police chief was investigating whether Petitioner violated his probation by possessing that shotgun; (4) after police obtained the shotgun, Petitioner threatened the police chief and another officer; (5) Officer Preston saw Petitioner in Ms. Johnson's vehicle; and (6) after Petitioner exited and walked away from Ms. Johnson's vehicle, and as

Officer Preston was returning to his patrol car, Petitioner's walk turned into headlong flight (Ex. A at 145–47, 161).

Moreover, appellate counsel could have reasonably concluded that Petitioner's intervening shooting at Officer Preston was sufficient to break the causal link between the allegedly unlawful initial stop and pursuit, and Petitioner's arrest (after which Petitioner made statements to officers, and officers collected evidence from the field and Preston's patrol car).  *See* United States v. Edmondson, 791 F.2d 1512, 1516 (11th Cir. 1986) (defendant's confession was prompted not by any misconduct of the officers, but by the defendant's own guilty conscience and desire to be caught, and was thus sufficiently purged of the taint of the illegal arrest); H.D., 113 So. 2d at 919 (juvenile's intervening trespass on private property, while fleeing police officer, was sufficiently attenuated from taint of unlawful BOLO alert for a black male fleeing scene on a bicycle such that intervening trespass provided officer with authority to stop juvenile; there was short period of time between issuance of BOLO and officer's seizure of cocaine from juvenile due to exploitation of BOLO, and juvenile committed trespass while in officer's presence); Clavette, 969 So. 2d at 467 (reversing trial court's suppression of testimony from deputies regarding fracas with defendant after deputies entered defendant's home; even if deputies' entry into defendant's home was

illegal, evidence that defendant lunged toward deputy, grabbed the barrel of his rifle, and fought with deputies, was not legally derivative of illegal entry and thus not required to be excluded at defendant's trial on charges of attempting to take a firearm from a law enforcement officer, resisting an officer with violence, battery on a law enforcement officer, and misdemeanor domestic violence battery; defendant's use of force was an independent act of misconduct, therefore, application of exclusionary rule was not warranted); State v. Freeney, 613 So. 2d 523, 525 (Fla. 2d DCA 1993) (evidence that defendant pushed officer backward, ran away, and continued to struggle was not "legally derivative" of allegedly illegal stop, and thus was not required to be excluded under exclusionary rule); State v. Taylor, 557 So. 2d 941 (Fla. 2d DCA 1990) (driver's abusive and highly confrontational behavior, immediately after his vehicle had been stopped for traffic infraction, justified driver's arrest for disorderly conduct and subsequent search of his vehicle).

In light of the trial court's careful consideration and explicit findings on the Fourth Amendment issues, and Petitioner's failure to demonstrate that the appellate review process was unavailable to him, the undersigned concludes that Petitioner was afforded a full and fair opportunity to litigate the Fourth Amendment issues, in

satisfaction of <u>Stone v. Powell</u>.  Therefore, federal review of the Fourth Amendment

issues raised in Grounds One and Two is unavailable.

>    B.    <u>Ground Three:  "Trial court and trial counsel violated Petitioner's due
>    process rights embodied under double jeopardy and created a manifest injustice.
>    Trial counsel did not object to the acquitted collateral crime evidence of
>    Petitioner's 1st trial (3-29-12).  Trial court did not reverse and remand
>    Petitioner's case even though Petitioner alleged this issue in his 1st 3.850."</u>

Petitioner asserts that at the time of his trial on the charge of possession of a

firearm by a convicted felon, he had been acquitted of the charge of attempted murder

of Officer Preston (ECF No. 1 at 7; ECF No. 2 at 5–6; ECF No. 25 at 7–11).  He

contends defense counsel was ineffective for failing to object to the admission of

"acquitted collateral crime" evidence, on the ground that it violated the constitutional

protection against double jeopardy, because it required him to resurrect his defense

to the attempted murder charge (*id.*).  Petitioner additionally contends trial counsel

should have argued that the jury's verdict acquitting him of the attempted murder

charge meant that the jury did not find Officer Preston's testimony credible; therefore,

the State was precluded from presenting Officer Preston's testimony at trial on the

possession charge (*id.*).  Petitioner additionally contends defense counsel should have

argued that the jury's verdict on the attempted murder charge necessarily determined

the issue of whether he was in possession of a firearm during the incident with Officer

Preston, and thus precluded the issue from being re-litigated at Petitioner's trial on the possession charge (*id.*). Petitioner asserts he presented these claims to the state courts in Ground Two of his Rule 3.850 motion (ECF No. 2 at 2).

Respondent concedes that Petitioner exhausted this claim in the state courts (ECF No. 20 at 26–27). Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 27–36).

### 1.   Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong

is "reasonableness under prevailing professional norms."   Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."   Id. at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do."   Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).   Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).   Counsel's performance is deficient only if it is "outside the wide range of professional competence."   Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").   "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."  Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).   Indeed,

"'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002).   The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

> 2.      Federal Review of State Court Decision

The entirety of Petitioner's argument of Ground Two of his amended Rule 3.850 motion was the following:

> Defendant alleges that his counsel was ineffective where counsel argued that collateral estoppel shall preclude the prosecution form [sic]

prosecuting Defendant when counsel should have argued the evidence
the state wanted to admit, or admitted, is evidence of an acquitted crime
and is not admissible in a subsequent collateral crime trial.  Had it not
been counsel ineffectiveness [sic] for not objecting to the admission of
the evidence, there is reasonable probability of a different outcome.

 (Ex. M at 15).

In the state circuit court's written decision denying the claim, the court correctly

stated the deficient performance and prejudice prongs of the Strickland standard as the

applicable legal standard (Ex. M at 19–20).   The court adjudicated the claim as

follows:

> [T]he Defendant's instant allegations fail to establish either prong
> of *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   Further,
> Defendant's allegations are conclusory in nature to warrant relief [sic].
> *See Kennedy v. State*. 547 So. 2d 912 (Fla. 1989) ("A defendant may not
> simply file a motion for post conviction relief containing conclusory
> allegations that his or her trial [counsel] was ineffective and then expect
> to receive an evidentiary hearing.").   Although a trial court in its
> discretion may grant more than one opportunity to amend an insufficient
> claim, *Spera* does not mandate repeated opportunities.   *See Nelson v.
> State*, 977 So. 2d 710 (Fla. 1st DCA 2001).   Since the Defendant was
> either unable or unwilling to cure the deficiency, his insufficient claims
> are denied with prejudice.   *See Id.*   Despite the foregoing, the
> Defendant's claims are without merit.

(Ex. M at 20).  Petitioner appealed the decision to the First DCA, and the appellate

court affirmed the lower court's decision without written opinion (Exs. O, P).

In Petitioner's § 2254 petition, he expands the argument he made to the state court.  Petitioner argues, as he did in state court, that defense counsel was ineffective for failing to object to the admission of "acquitted collateral crime" evidence, on the ground that it violated the constitutional protection against double jeopardy, because it required him to resurrect his defense to the attempted murder charge (ECF No. 1 at 7; ECF No. 2 at 5–6; ECF No. 25 at 7–11).  But Petitioner additionally contends counsel should have argued that the jury's verdict acquitting him of the attempted murder charge necessarily meant that the jury did not find Officer Preston's testimony credible; therefore, the State was precluded from presenting Officer Preston's testimony at trial on the possession charge (*id.*).  And Petitioner further contends defense counsel should have argued that the jury's verdict on the attempted murder charge necessarily determined the issue of whether he was in possession of a firearm during the incident with Officer Preston, and thus precluded the issue from being re-litigated at Petitioner's trial on the possession charge (*id.*).

Petitioner cannot succeed on the last argument (that defense counsel should have argued that the jury's verdict on the attempted murder charge necessarily determined the issue of whether he was in possession of a firearm during the incident with Officer Preston, and thus precluded re-litigation of the issue at Petitioner's trial

for possession of a firearm).  Prior to Petitioner's trial on the possession charge, defense counsel filed a motion to dismiss, arguing that the Double Jeopardy Clause of the Fifth Amendment embodied the concept of collateral estoppel, and that the jury in Petitioner's attempted murder trial necessarily concluded, that Petitioner did not have a firearm in his possession; therefore, the State was precluded from re-litigating that issue (Ex. B at 293–94).  The trial court held a hearing on the motion to dismiss and denied it (*id.* at 296–301).  Additionally, defense counsel renewed the motion after the State rested its case (*see* Ex. D at 113).  The trial court again denied it (*id.* at 114).  Petitioner thus cannot show that defense counsel was deficient for failing to make the exact argument that Petitioner faults him for not making.

Petitioner also failed to establish deficient performance with respect to defense counsel's failure to argue that Officer Preston's testimony was wholly inadmissible because the jury in the attempted murder trial necessarily found his testimony incredible.  There is no evidence that the jury made such a finding.  Officer Preston's testimony was not the only evidence presented to the jury at Petitioner's trial on the attempted murder charge.  Eugene McMillan testified that on July 3, 2010, he was pulled off on the side of Highway 90 in Sneads, Florida because he had a flat tire (Ex. D at 29–39).  He testified that he saw a police car pull up behind a stopped car.  Mr.

McMillan testified that as the officer started walking toward the car, a young black man exited the car and started walking away.  McMillan testified that the officer told the man he should stop, but the man kept walking.  McMillan testified that the officer turned and went back to his car, and the black man started running across a field.  Mr. McMillan testified that after the man started running, the officer began driving behind him.  Mr. McMillan testified that he heard shots fired.  He testified that the first set of shots were fired in slower succession than the second set of shots.  McMillan testified that the second set of shots sounded like they were fired from a semi-automatic firearm.  Mr. McMillan testified that he did not know if the officer was inside or outside of his patrol car when the shots were fired.

Officer Brett Preston testified, in relevant part, that Petitioner was running in a zig-zag pattern in the field, and he (Preston) was pursuing him in his patrol car (Ex. D at 46–78).  Preston testified that Petitioner stopped running, spun around, and shot at his patrol car.  Officer Preston testified that he saw the gun from which Petitioner was shooting.  Preston testified that he remembered glass hitting him.  He testified that he did not remember how many times Petitioner shot, nor did he remember getting shot.  Preston testified that he realized he had been shot when he exited the patrol car and returned fire.  He testified that when he went to reload his Glock 40, he noticed

that his finger looked as if it was about to come off.  Preston testified that he was

attempting to exit his patrol car when Petitioner shot at him, but he "felt like [he]

was stuck there."  He testified that he had his hand on his firearm when he realized that

Petitioner was shooting at him.  Officer Preston testified that he did not recall shooting

out of his windshield, but that he easily could have done that.  Preston testified that

he started shooting back at Petitioner once he exited his patrol car and after Petitioner

stopped shooting.  Preston testified that once Petitioner stopped shooting, Petitioner

turned around and started running, and Preston got out and pursued him and started

shooting.  Preston testified that he ran after Petitioner, but Petitioner hopped onto a

passing train, and Preston lost sight of him.  Officer Preston testified he was shot in

his left hand, left knuckle, and right forearm.  On cross-examination, Officer Preston

admitted that in a pre-trial statement, he stated that he did not shoot from inside his

vehicle, but he realized after-the-fact that he did.  Preston testified that he shot 42

bullets during the shooting.  Officer Preston testified that he did not remember when

his finger was hit.  He testified that he could not say whether his finger was hit when

he was inside or outside of the patrol car.  However, he testified that he was certain

that he was in the patrol car when all the shots were fired at him.  Officer Preston

admitted that he could have shot the door of his patrol car, and he admitted he shot

through the windshield, but he denied that he could have shot himself in the finger when he was opening the door of his patrol car.

Dr. Sared Ashoo testified that he was an emergency physician at Tallahassee Memorial Hospital (Ex. D at 95–102).  Dr. Ashoo testified that he treated Officer Preston for multiple gunshot wounds, specifically, one to his left hand, another to his left shoulder, and a third to his right forearm.  Dr. Ashoo testified that with regard to the left hand, there was injury to the skin and the bone.  He testified that the injuries to the shoulder and forearm were abrasions.

Troy Roper, a special agent with the Florida Department of Law Enforcement ("FDLE"), testified that he collected evidence from Officer Preston's patrol car, including blood swabbings from the windshield (Ex. D at 79–94).  Roper testified that he recovered Officer Preston's gun, a Glock 40 caliber handgun, from the hood of the patrol car.  Agent Roper testified that several agencies searched for a second gun, but a second gun was never recovered.

Ted Berman, a senior crime laboratory analyst with the FDLE, testified that he examined the windshield of Officer Preston's patrol car to analyze the holes in the windshield to determine from which direction the bullets came (Ex. D at 130–40).  Berman testified that he determined that a hole in the center of the windshield was

created from impact from the inside of the car going out.  He testified that a hole on

the driver's side of the windshield was created from impact from the outside of the car

coming into it.  Mr. Berman testified that he was unable to determine which hole was

created first.  He testified that he was also unable to determine the distance of the gun

from the windshield when each hole was created.

Leann Hodge, a crime laboratory analyst in the FDLE's Biology Section,

testified that she performed DNA analysis of buccal swabs from Officer Preston and

blood swabbings from the inside windshield of Preston's patrol car (Ex. D at 140–51).

She testified that the blood on the windshield matched Officer Preston's DNA.


Charles Richards, a senior crime laboratory analyst in the FDLE's Latent Print

Section, testified that he photographed Officer Preston's patrol car, including

photographs of bullets and bullet fragments, and photographs of the inside and outside

of the car (Ex. D at 103–20).  Mr. Richards testified that it appeared that a bullet or

projectile traveled from inside the car to the outside, because metal on the door was

pushed out.  He testified that this could have been the result of an accidental discharge

of Officer Preston's firearm.  Mr. Richards testified that bullets and fragments were

recovered from inside the "quarter panel" on the driver's side, the right front

passenger floorboard, the top of a briefcase on the right front passenger seat, and the driver's seat.

John Ryan, a crime laboratory analyst in the FDLE's Firearms Section, testified that he examined several projectiles and bullet pieces recovered from Officer Preston's patrol car, and determined that they were all from a 38 caliber class firearm, but only three were from the same firearm (Ex. D at 153–66).  Ryan testified that a Glock 40 is a semi-automatic weapon, but most 38 caliber guns are revolvers.  Mr. Ryan testified that Ruger, Smith & Wesson, and Taurus were the three main manufacturers of 38 caliber guns.

Boyd Holmes testified for the defense (Ex. D at 178–84).  He testified that Petitioner is his wife's nephew.  He testified that on his way home from the store on July 3, 2010, the police searched his car for Petitioner.  Mr. Holmes testified that shortly thereafter, he was sitting under a tree at his brother's house, and Petitioner walked out a field into the yard.  Mr. Holmes testified that Petitioner had dried blood and fresh blood on his shirt.  Mr. Holmes testified that Petitioner said he had been shot.  Holmes testified that he did not see a gun on Petitioner.  He testified that they convinced Petitioner to turn himself in to police, and Petitioner did so after 15–20

minutes.  Mr. Holmes testified that Petitioner's uncle drove Petitioner to police.  He testified that the police searched the uncle's car and found a gun that belonged to Petitioner's uncle.  Mr. Holmes testified that Petitioner never mentioned that he shot at anyone.

Deborah Baker, Petitioner's mother, also testified (Ex. D at 188–91).  She testified that on July 3, 2010, after she heard about the incident involving Petitioner, she called different hospitals, but could not locate Petitioner. She testified that she asked the police where Petitioner was and if he was okay, but they did not provide her any information, and just told her that they would keep her informed.  Ms. Baker testified that she finally saw Petitioner 2–3 weeks later at the jail.  She testified that Petitioner showed her the wound from where he had been shot in the back.

The jury was instructed on the charged offense (attempted first degree murder) and lesser included offenses, the least serious of which was attempted voluntary manslaughter (Ex. D at 245).  The jury was instructed that to find Petitioner guilty of the least serious crime, the State was required to prove that Petitioner intentionally committed an act which would have caused and resulted in the death of Officer Preston, except that someone prevented Petitioner from killing Officer Preston, or Petitioner failed to do so (*id.*).  The jury was also instructed that it was not an attempt

to commit manslaughter if Petitioner abandoned the attempt to commit the offense or otherwise prevented its commission under circumstances indicating a complete and voluntary renunciation of his criminal purpose (*id.*).

Based upon the evidence presented, the jury's not guilty finding did not necessarily mean that the jury found Officer Preston's testimony incredible. The verdict could have meant that the jury was not convinced beyond a reasonable doubt that Petitioner intentionally committed an act which would have caused and resulted in Officer Preston's death, but he failed to kill Preston; or the verdict could have meant that the jury believed that Petitioner abandoned the attempt under circumstances indicating a complete and voluntary renunciation of his criminal purpose (*see* Ex. D at 245). In the absence of any indication that the jury in the attempted murder case actually found that Officer Preston's testimony was wholly incredible, defense counsel had no meritorious basis for seeking exclusion of Officer Preston's testimony at the possession trial.

Further, Officer Preston's credibility was not an issue of law for the trial judge; rather, it was an issue of fact to be considered and determined by the jury. *See* Carpenter v. State, 785 So. 2d 1182, 1203 (Fla. 2001). Therefore, defense counsel

was not ineffective for failing to challenge the admissibility of Officer Preston's testimony at the trial on the possession charge.

This leaves Petitioner's argument that defense counsel should have argued that evidence of the "acquitted crime," i.e., Petitioner's shooting at Officer Preston, was inadmissible "collateral crime" evidence.  Generally, evidence of acquitted crimes is not admissible under Florida law.  *See* Moore v. State, 127 So. 3d 608 (Fla. 4th DCA 2012).    However, an acquittal in a previous criminal proceeding does not automatically preclude referring to the crime as evidence in a subsequent criminal case if evidence of the prior crime is relevant to the prosecution.  *See* Lawson v. State, 304 So. 2d 522 (Fla. 3ed DCA 1974).  The Florida Supreme Court provided an exception to general rule that evidence of an acquitted crime cannot be presented at a subsequent trial, when it is impossible to give a complete or intelligent account of the crime charged without referring to the other crime.  *See* Nickels v. State, 90 Fla. 659, 106 S. 479 (1925).  Evidence completing the story of the crime on trial is admissible under Florida Statute § 90.402.  *See* Ferrell v. State, 686 So. 2d 1324, 1329 (Fla. 1996).  Evidence "inextricably intertwined in time and place with the crimes charged and necessary to fully describe the way in which the criminal deed happened" is admissible under § 90.402.  T.S. v. State, 682 So. 2d 1202 (Fla. 4th DCA 1996).

Evidence "inseparably linked in time and circumstances" to the scenario of the crime

is relevant.  Erickson v. State, 565 So. 2d 328, 333 (Fla. 4th DCA 1990).

Admissible "inseparable crime" evidence "explains or throws light upon the crime

being prosecuted," and allows the State "to present an orderly, intelligible case."

Tumulty v. State, 489 So. 2d 150, 153 (Fla. 4th DCA 1986).  The rule regarding

admission of collateral crime evidence, announced in Williams v. State, 110 So. 2d

654 (Fla. 1959), does not distinguish between evidence of acquitted crimes and

evidence of collateral crimes for which there has not been an acquittal, including

uncharged crimes, crimes for which the charges were dropped, and convicted crimes.

In Petitioner's trial for possession of a firearm by a convicted felony, the only

evidence of Petitioner's involvement in the shooting of Officer Preston was Officer

Preston's testimony, and Petitioner's recorded statement to an FDLE agent.[5]  The

_____

[5] The State also introduced testimony from Charles Richards, the analyst from the FDLE
Latent Print and Crime Scene sections (Ex. F at 49–54).  Mr. Richards testified that he collected the
following evidence from Officer Preston's patrol car:  (1) a bullet from the driver's seat (State's
Exhibit 5), (2) a "copper jacketing" from the top of a briefcase sitting in the front passenger seat
(State's Exhibit 7), (3) a piece of lead/suspected bullet from the front passenger floorboard (State's
Exhibit 10), and (4) a bullet recovered from the left front fender or "quarter panel" (State's Exhibit
16).

The State introduced testimony from John Ryan, the analyst from the FDLE Firearms
Section, who testified that State's Exhibit 5, 7, 10, and 16 were 38 caliber class projectiles (Ex. F
at 62–68).  Ryan testified that three of the four were fired from the same gun.  He testified that none
of them were 40 caliber.

The State also introduced testimony from Chadeedra Johnson.  She testified that Petitioner

State elicited the following testimony from Officer Preston (Ex. F at 23–27). Preston testified that on July 3, 2010, he stopped Chadeedra Johnson's car to ask her where he could find Petitioner to talk to him. Preston testified that when Johnson stopped her car, he (Preston) saw Petitioner in the passenger seat. Officer Preston testified that Petitioner exited the car and walked toward a field. Preston testified that Petitioner started running, so he got in his patrol car and pursued him. Officer Preston testified that the pursuit came to an end in a field, because Petitioner turned around and fired shots into his patrol car. Preston testified that he actually saw Petitioner with a gun in his hand. Officer Preston testified that he returned fire and shot Petitioner. Preston testified that Petitioner left the scene by jumping onto a passing train.

The only other evidence of the shooting was Petitioner's recorded interview with Special Agent Michael Kennedy (Ex. F at 72–108). Agent Kennedy testified that he and another agent, Annie White, interviewed Petitioner on July 3, 2010, at the hospital and recorded the interview. An audio recording of the interview, which was redacted to remove references to several of Petitioner's prior "bad acts," was published to the jury. The only mention of the shooting that the jury heard was an

---

did not have a gun with him when he was in her car on July 3, 2010; although she admitted she had given several prior, sworn statements that were inconsistent with that testimony (Ex. F at 40–48).

introductory statement from Agent White, in which she mentioned that she was interviewing Petitioner because an officer was involved in a shooting.  During the interview, Petitioner stated that Officer Preston pulled out a gun and shot, so he (Petitioner) shot back.  Petitioner stated that he shot twice, but did not know if he hit Officer Preston.  Petitioner stated that he had a "32" automatic gun.  When asked what he did with the gun, Petitioner responded that it was in the back of a field.  Petitioner described the gun as brown, and said that it was owned by his deceased uncle.  Most of Petitioner's statement was comprised of his description of Officer Preston's shooting at him.

Defense counsel could have reasonably concluded that an objection to the admission of evidence that Petitioner shot at Officer Preston would not have been successful, because evidence that Petitioner shot at Preston was necessary to give a complete and intelligent account of the context out of which the possession charge arose.  Further, Preston's testimony about the shooting was brief and less detailed than his testimony during the attempted murder trial, and it was no more than necessary to convey the circumstances of his observing Petitioner with a firearm.  Additionally, defense counsel limited the information to which the jury was exposed during

publication of Petitioner's recorded statement, to only the circumstances of his encounter with Officer Preston from which the possession charge arose.

Petitioner failed to show that the state court's adjudication of his ineffective assistance of counsel claim was contrary to or an unreasonable application of Strickland.  Therefore, he is not entitled to federal habeas relief on Ground Three.

## IV.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 14<u>th</u> day of March 2016.

<u>/s/ *Elizabeth M. Timothy*</u>
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**